NANOPIERCE TECHNOLOGIES, INC., A NEVADA CORPORA-
TION; STEPHEN SEITZ, AN INDIVIDUAL; JANE SEITZ, AN
INDIVIDUAL; KATHY KNIGHT-McCONNELL, AN INDIVID-
UAL; JAMES STOCK, AN INDIVIDUAL; MAUREEN
O'SULLIVAN, AN INDIVIDUAL; AND HELEN KOLADA, AN
INDIVIDUAL, APPELLANTS, v. THE DEPOSITORY TRUST
AND CLEARING CORPORATION; THE DEPOSITORY
TRUST COMPANY; AND THE NATIONAL SECURITIES
CLEARING CORPORATION, RESPONDENTS.

No. 45364

September 20, 2007 168 P.3d 73

[Rehearing denied November 5, 2007]

HARDESTY, J., with whom DOUGLAS, J., agreed, dissented in
part.

*Lionel Sawyer & Collins* and *David N. Frederick, Samuel S.
Lionel*, and *Dan C. Bowen*, Reno, for Appellants.

*Laxalt & Nomura, Ltd.*, and *Daniel T. Hayward, Bruce R. Lax-
alt*, and *Don Nomura*, Reno; *Proskauer Rose LLP* and *Gregg M.
Mashberg* and *Karen D. Coombs*, New York, New York; *William
E. Cooper Law Offices* and *William E. Cooper Jr.*, Las Vegas, for
Respondents.

*Bailey Merrill* and *Dennis L. Kennedy* and *Sarah E. Harmon*,
Las Vegas; *Rex Staples*, General Counsel, *Stephen W. Hall*,
Deputy General Counsel, and *Joseph Brady* and *Lesley M. Walker*,
Associate Counsel, Washington, D.C., for Amicus Curiae North
American Securities Administrators Association, Inc.

*Brian G. Cartwright*, General Counsel, *Jacob H. Stillman*, Solicitor, *Mark Pennington*, Assistant General Counsel, and *Michael L. Post*, Senior Counsel, Washington, D.C., for Amicus Curiae SEC.

*Woodbury & Kesler* and *Nicholas E. Hales*, Salt Lake City, Utah, for Amicus Curiae National Coalition Against Naked Shortselling.

Before the Court EN BANC.

## OPINION

By the Court, SAITTA, J.:

This case arises from respondents' use of the Stock Borrow Program to facilitate clearing and settling certain broker-to-broker securities transactions. "Clearing and settling" essentially refers to the process by which record ownership of securities is exchanged for funds when sellers transfer securities to purchasers. Respondents are a holding company and its two subsidiary clearing agencies. The clearing agencies and the Stock Borrow Program were created under federal Securities Exchange Commission (Commission) guidelines to expedite the clearing and settling process that, when performed on the scale that respondents perform it—millions of transactions daily—would otherwise be cumbersome, confusing, and costly.

According to appellants Nanopierce Technologies, Inc., and some of its shareholders, respondents' use of the Stock Borrow Program impermissibly decreased Nanopierce's stock value, irrespective of normal market forces. Consequently, appellants instituted the case below, asserting state law challenges to respondents' operation, and representation to participants, of the Stock Borrow Program. The district court ultimately dismissed the action, concluding that federal law in the area of clearing and settling securities transactions preempted appellants' claims. This appeal followed.[1]

The question presented is whether section 17A of the Securities Exchange Act of 1934 preempts appellants' state law claims for damages. We agree with the district court that appellants' state law challenges related to the Stock Borrow Program are preempted by federal statutes and regulations. Specifically, we conclude that, because the state law on which appellants base their claims poses an obstacle to respondents' accomplishment of congressional objectives as explicitly stated in and gleaned from the Securities Ex-

---

[1]Respondents have filed a motion under NRAP 31(d) requesting leave to file a "Statement of Supplemental Authorities." Having considered the motion, and appellants' opposition thereto, we grant it. Accordingly, we direct the court clerk to file respondents' "Statement of Supplemental Authorities," provisionally received on June 22, 2007.

change Act's framework, and because respondents' compliance with both state and federal requirements concerning the securities transactions at issue in this case is impossible, section 17A of the Securities Exchange Act preempts appellants' claims.

In explaining that determination, we initially set forth a somewhat detailed discussion of respondents' and the Stock Borrow Program's federally enacted roles in clearing and settling broker-to-broker securities transactions, as necessary to understand appellants' causes of action. We then generally set forth the various preemption analyses, before determining the preemption analytical framework necessary to address appellants' causes of action. Finally, we analyze appellants' causes of action in light of that framework to determine whether federal enactments with respect to clearing and settling securities transactions preempt appellants' state law causes of action.

## OVERVIEW

*The Stock Borrow Program and its primary clearing agencies—The Depository Trust Company and The National Securities Clearing Corporation*

The Stock Borrow Program is principally a result of difficulties that arose under the Securities Exchange Act of 1934, which Congress enacted generally to regulate and control securities transactions in interstate commerce, and specifically to "remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions."[2] In 1975, to modernize the system in light of technical advances, Congress amended the Securities Exchange Act of 1934 to add section 17A, which directed the Commission to establish a national system "to facilitate" the efficient clearance and settlement of securities transactions, including registering and regulating clearing agencies.[3]

The primary clearing agencies that the Commission registered, under section 17A, are respondents The Depository Trust Company (DTC) and The National Securities Clearing Corporation (NSCC),[4] subsidiaries of respondent The Depository Trust and Clearing Corporation. With respect to registering the NSCC, the Commission specifically determined that the NSCC's "by-laws, rules, procedures, and systems," including the Stock Borrow Program, were consistent with the Commission's standards and re-

---

[2]15 U.S.C. § 78b (2000).

[3]*Id.* § 78q-1(a)(2)(A).

[4]*See* Depository Trust Co., et al., 48 Fed. Reg. 45,167 (SEC Oct. 3, 1983).

quirements.[5] The DTC and the NSCC are also registered with the Commission as self-regulatory organizations; the Commission has effectively delegated some of its authority to regulate the clearance and settlement of securities transactions to respondents.[6] Respondents thus stand in the Commission's shoes when performing their functions.[7]

Together, the DTC and NSCC, as regulated by the Commission, provide automated clearance and settlement of broker-to-broker securities transactions.[8]

### The DTC

The DTC, for its part in facilitating the clearance and settlement of securities transactions, acts as a stock depository, retaining in its vaults the physical stock certificates that a broker has deposited with it on behalf of an investor. Any broker deposit is reflected as a credit in that broker's corresponding DTC account. Although brokers deposit the physical stock certificates with the DTC on behalf of individual investors, all certificates are held in the DTC's vaults in the name of the DTC's nominee, Cede & Co. Thus, once deposited, stock certificate ownership changes are merely recorded electronically in the brokers' respective DTC accounts—no movement of the physical stock certificates occurs.

### The NSCC

While the DTC's role in clearing and settling securities transactions essentially includes only retaining the physical stock certificates and updating brokers' DTC accounts to reflect transfers of stock ownership, the NSCC facilitates the actual clearance and settlement of the securities by (1) acting as an intermediary between brokers engaged in a securities transaction, and (2) tracking, over a designated trading period, a broker's transactions with respect to a specific security.

In its role as an intermediary, the NSCC assumes the payment and delivery obligations of the buying and selling brokers, respectively. As regards the NSCC's tracking function, the NSCC keeps track of all of a broker's transactions with respect to a specific security over a designated trading period. This function allows a broker to deliver to or receive from the NSCC, which as noted has as-

---

[5]*See id.* at 45,178; *see also* 15 U.S.C. § 78q-1(b)(2)-(3); National Securities Clearing Corporation, 46 Fed. Reg. 3104 (proposed Jan. 13, 1981).

[6]*See* 15 U.S.C. § 78s(a) (2000); Self-Regulatory Organizations, Exchange Act Release No. 34-47978, 80 SEC Docket 1143 n.50 (June 4, 2003).

[7]*See Dexter v. Depository Trust and Clearing Corp.*, 406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005).

[8]*See* 15 U.S.C. § 78q-1(b)(3)(A).

sumed the broker's purchase and delivery obligations, the net amount resulting from his purchase and sales of that particular security at the end of the designated trading period.

After the NSCC calculates a broker's payment or delivery obligation with respect to a specified security for a designated trading period, the broker normally owes or is owed shares of that security. The NSCC then transmits that information to the DTC for processing. For the selling broker, the DTC compares the broker's share delivery obligation, if any, to the amount of that share held in the broker's DTC account, to determine whether the broker possesses enough shares to fulfill his delivery obligation. If enough shares are present in the selling broker's DTC account to fulfill that delivery obligation, delivery of those shares occurs by sending the shares through the NSCC to the DTC account of the party owed the securities, the buying broker. If, however, the selling broker does not have enough shares in his DTC account to cover the obligation, *i.e.*, the broker has sold more shares than he possesses, two options for covering the unfilled obligation generally exist: (1) the buying broker, who is owed the shares, after notifying the NSCC, may purchase in the open market the number of shares owed to him—so-called buying-in; or (2) the buying broker simply can wait for the amount of shares owed to him to become available as other securities transactions are processed through the NSCC. According to appellants, these two options were available to a broker before the NSCC implemented the Stock Borrow Program.

### Stock Borrow Program

Apparently to obviate the need for a buying broker to exercise either of the two aforementioned options, *i.e.*, to reduce the instances of a buying broker failing to receive the shares owed to him, the NSCC implemented the Stock Borrow Program. The Stock Borrow Program enables NSCC and DTC brokers to lend shares from their DTC accounts to cover another broker's failure to deliver shares to the NSCC, before any actual failure to deliver occurs. The Stock Borrow Program essentially operates by allowing brokers, otherwise unrelated to the securities transaction that resulted in the delivery obligation, to loan securities that they have on deposit with the DTC to satisfy the delivery obligation.

According to appellants, respondents, as well as brokers, are able to profitably manipulate the Stock Borrow Program, to appellants' detriment. Appellants contend that respondents use undisclosed internal loopholes in the Stock Borrow Program for their own benefit by generating so-called phantom shares, which, appellants allege, have a dilutive effect on Nanopierce's stock value. Because respondents purportedly obscure this process and its effects, appellants assert that they are entitled to relief under state law.

## DISCUSSION

### Preemption

Having set forth respondents' operation of the Stock Borrow Program and the bases of appellants' challenges, we now discuss whether federal law preempts appellants' state law challenges related to the Stock Borrow Program. Whether state law is preempted by a federal statute or regulation is a question of law,[9] subject to our de novo review.[10] As an initial matter, we note that, although the Stock Borrow Program itself and the rules describing and governing its operation are not federal law *per se*, the Commission promulgated federal regulations, based on Congress's directive set forth by statute, section 17A of the Securities Exchange Act of 1934, as amended,[11] that, among other things, approved the NSCC's rules concerning the Stock Borrow Program's operation.[12]

The preemption doctrine, which provides that federal law supersedes conflicting state law, arises from the Supremacy Clause of the United States Constitution.[13] The Supremacy Clause, found in Article VI, requires that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[14] Thus, when a conflict exists between federal and state law, valid federal law overrides, *i.e.*, preempts, an otherwise valid state law.[15] Whether a federal enactment preempts state law is fundamentally a question of congressional intent—did Congress expressly or impliedly intend to preempt state law?[16] Even when implied, Congress's intent to preempt state law, in light of a strong presumption that areas historically regulated by the states generally are not su-

---

[9]*Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 260 (Ill. 2006); *Doty v. Frontier Communications Inc.*, 36 P.3d 250, 257 (Kan. 2001).

[10]*SIIS v. United Exposition Services Co.*, 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

[11]15 U.S.C. § 78q-1(a)(2)(A).

[12]*See* National Securities Clearing Corporation, 46 Fed. Reg. 3104 (proposed Jan. 13, 1981); Depository Trust Co., et al., 48 Fed. Reg. 45,167 (SEC Oct. 3, 1983); *see also Hillsborough County v. Automated Medical Labs.*, 471 U.S. 707, 713 (1985) (noting that "state laws can be pre-empted by federal regulations as well as by federal statutes").

[13]*Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (stating that "[a] fundamental principle of the Constitution is that Congress has the power to preempt state law").

[14]U.S. Const. art. VI, cl. 2.

[15]*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

[16]*Id.*; *see also Barnett Bank of Marion Cty., N. A. v. Nelson*, 517 U.S. 25, 30 (1996).

perseded by a subsequent federal law, must be " 'clear and manifest.' "[17]

### Express preemption

Congress expressly preempts state law when it explicitly states that intent in a statute's language.[18] Thus, when determining whether Congress has expressly preempted state law, a court must examine statutory language—any explicit preemption language generally governs the extent of preemption.[19]

### Implied preemption

When Congress does not include statutory language expressly preempting state law, Congress's intent to preempt state law nonetheless may be implied in two circumstances known as field preemption and conflict preemption. First, under field preemption, preemption is implied when congressional enactments so thoroughly occupy a legislative field, or touch a field in which the federal interest is so dominant, that Congress effectively leaves no room for states to regulate conduct in that field.[20] To determine whether Congress has preempted a field of law, the entire regulatory scheme must be examined to determine whether, based on its level of comprehensiveness or the nature of the field regulated, Congress intended to preclude states from also imposing requirements on that field.[21] If, based on that examination, it can be inferred that Congress intended to occupy that legislative field, state requirements are preempted regardless of any specific law's conflict.[22]

Second, even when Congress's enactments do not pervade a legislative field or regulate an area of uniquely federal interest, Congress's intent to preempt state law is implied to the extent that federal law actually conflicts with any state law.[23] Conflict preemption analysis examines the federal statute as a whole to determine

---

[17]*Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)); *see also Davidson v. Velsicol Chemical*, 108 Nev. 591, 594, 834 P.2d 931, 933 (1992).

[18]*Cipollone*, 505 U.S. at 516.

[19]*Id.* at 517; *Davidson*, 108 Nev. at 594, 834 P.2d at 932.

[20]*Cipollone*, 505 U.S. at 516; *Hillsborough County*, 471 U.S. at 713.

[21]*Hillsborough County*, 471 U.S. at 713.

[22]*Cipollone*, 505 U.S. at 516.

[23]*Id.*

whether a party's compliance with both federal and state require-
ments is impossible or whether, in light of the federal statute's pur-
pose and intended effects, state law poses an obstacle to the ac-
complishment of Congress's objectives.[24]

### Field preemption

As an initial matter, we note that, although the parties do not ad-
dress whether appellants' claims are expressly preempted by any
explicit statutory language, no provision within the Securities Ex-
change Act of 1934, or Congress's amendments thereto, reveals
congressional intent to do so.[25] On appeal, appellants essentially
contend that the district court erred in applying a field preemption
analysis to their claims and concluding in light of that analysis that,
because Congress's enactments so thoroughly occupy the legisla-
tive field of clearing and settling securities transactions, Congress
intended to preclude state law claims like appellants' from impos-
ing any additional requirements on that field. Implicit in appel-
lants' argument is that conflict preemption is the appropriate ana-
lytical framework with respect to determining whether federal law
governing clearing and settling securities transactions conflicts
with and thus preempts their state law claims. According to ap-
pellants, their state law claims do not actually conflict with Con-
gress's statutory framework.[26]

With regard to whether Congress intended to occupy the entire
field of securities regulation, or more narrowly, the field of clear-
ing and settling securities transactions, provisions within the statu-
tory framework, analyzed in light of states' historical domination
over the field of securities regulation, indicate that Congress did
not intend to occupy those fields to the exclusion of state law. Al-
though the statutory scheme indicates Congress's intent to occupy
much of the securities regulation area, including the clearing and
settling of securities transactions, an examination of Congress's
statutory scheme with respect to securities transactions does not re-

[24]*Crosby*, 530 U.S. at 373.

[25]We note, moreover, that although an express preemption provision raises
a reasonable inference that it evidences the entire extent of Congress's intent
to preempt, so that further analysis to determine if any other matters are pre-
empt under an implied preemption theory is unnecessary, that inference is
merely an indication of congressional intent, and thus does not foreclose the
possibility of implied preemption. *Freightliner Corp. v. Myrick*, 514 U.S. 280,
288-89 (1995) (citing *Cipollone*, 505 U.S. at 518).

[26]Appellants' arguments notwithstanding, the district court's order dismiss-
ing appellants' complaint did not expressly state whether the order was based
on field or conflict preemption, though the court analyzed and employed lan-
guage characteristic of both doctrines. The court mentioned express preemp-
tion only prefatorily.

veal the comprehensiveness necessary to infer that Congress intended to wholly occupy that legislative field.[27]

Specifically, when enacting the Securities Exchange Act of 1934, Congress included a provision recognizing that the Securities Exchange Act did not impact any non-conflicting state securities laws:

> [T]he rights and remedies provided by [the Securities Exchange Act of 1934] shall be in addition to any and all other rights and remedies that may exist at law or in equity . . . . [N]othing in this [Act] shall affect the jurisdiction of the securities commission . . . of any State over any security or any person insofar as it does not conflict with the provisions of this [Act] or the rules and regulations thereunder.[28]

This provision does not indicate congressional intent to occupy the entire field of securities regulation, but rather, to occupy that field only inasmuch as state laws "conflict with the provisions of [the Act] or the rules and regulations thereunder."[29]

Likewise, with respect to the narrower field of a uniform nationalized system for clearing and settling securities transactions, as mentioned, Congress authorized the Commission to regulate this area in 1975 when it amended the Securities Exchange Act of 1934 to add section 17A.[30] Although no court opinion appears to address Congress's preemptive intent with respect to section 17A, a provision within section 17A and a subsequent amendment indicate an intent to not wholly occupy that legislative field.

For instance, Congress included a provision in section 17A stating that section 17A shall not "be construed to impair the authority of any State banking authority or other State . . . regulatory authority having jurisdiction over a person registered as a clearing agency . . . to make and enforce rules . . . which are not inconsistent with" section 17A and any rules and regulations promulgated based on section 17A.[31] That provision unambiguously signifies that Congress did not intend to occupy the entire field of

---

[27]*See Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1107 (4th Cir. 1989) (recognizing that, within the field of securities, "[t]he states enjoy broad powers to regulate such diverse subjects as [the following]: the registration of securities; the registration of broker-dealers, agents, and investment advisors; and fraud in the sale or purchase of securities and the rendering of investment advisory services").

[28]15 U.S.C. § 78bb(a).

[29]*Id.; accord Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) (noting that 15 U.S.C. § 78bb(a) revealed that Congress "rejected the notion that the express remedies of the securities laws would pre-empt all other rights of action").

[30]15 U.S.C. § 78q-1(a)(2)(A).

[31]15 U.S.C. § 78q-1(d)(4).

national clearance and settlement of securities transactions, since Congress explicitly left room for state banking and regulatory authorities to supplement that legislative field's regulation, so long as any state regulation is not inconsistent with section 17A.

A subsequent amendment likewise reveals congressional intent not to comprehensively regulate the entire national securities clearance and settlement field. Congress amended section 17A, in 1990, to add the following provisions allowing the Commission to adopt rules inconsistent with state law, but permitting, within two years' time, the states to then enact laws that contradict the Commission's rules:

> Notwithstanding any provision of State law, . . . [after making certain findings,] the [Securities Exchange] Commission may adopt rules concerning . . . the transfer of certificated or uncertificated securities . . . or limited interests (including security interests) therein; and . . . [the] rights and obligations of purchasers, sellers, owners, lenders, borrowers, and financial intermediaries (including . . . clearing agencies) involved in or affected by such transfers, and the rights of third parties whose interests in such securities devolve from such transfers.[32]

> Any State may, prior to the expiration of 2 years after the [Securities Exchange] Commission adopts a rule under this subsection, enact a statute that specifically refers to this subsection and the specific rule thereunder and establishes, prospectively from the date of enactment of the State statute, a provision that differs from that applicable under the [Securities Exchange] Commission's rule.[33]

In light of these two provisions, Congress explicitly left room for state laws to supplement the federal regulatory scheme and thus did not reveal a " 'clear and manifest' " intent to occupy the field of regulating clearing agencies.[34] Accordingly, no field preemption exists.[35]

### Conflict preemption

Because Congress did not expressly preempt appellants' claims by explicitly stating that intent within the provisions of the Securities Exchange Act, or its amendments thereto, and no field pre-

---

[32]15 U.S.C. § 78q-1(f)(1).

[33]15 U.S.C. § 78q-1(f)(3).

[34]*Bates*, 544 U.S. at 449 (quoting *New York State Conference of Blue Cross & Blue Shield Plans*, 514 U.S. at 655).

[35]Importantly, moreover, the question here, whether appellants' state-law based claims fit within any of section 17A's provisions to the extent that those provisions leave room for states to impose their own requirements is somewhat inapposite to the issue whether, in light of the statutory scheme Congress en-

emption exists, conflict preemption analysis is the appropriate analytical framework in this matter. As noted, conflict preemption analysis generally requires measuring state law claims against the federal statutory framework, and the federal statute's effects and purpose as revealed by that framework, to determine whether a party's compliance with both state and federal law requirements is impossible, or whether the act's purpose would be frustrated if state law were to apply. Here, then, we must determine whether imposing the requirements implicated by appellants' state law claims on respondents is inconsistent with section 17A's purpose of allowing the Commission to regulate and control a national system for clearing and settling securities transactions.[36]

### Appellants' misrepresentation-based claims

To determine whether appellants' claims are inconsistent with respondents' authority delegated from the Commission to operate a Commission-approved national system of clearance and settlement of securities transactions, we necessarily examine the claims.[37] For the purposes of this examination, appellants' claims can be divided into two groups: (1) misrepresentation claims, and (2) non-misrepresentation claims.

 ██ █

Appellants' complaint asserted four misrepresentations with respect to respondents' operation of the Stock Borrow Program. Each alleged misrepresentation provides the basis for appellants' separately asserted causes of action for negligent misrepresentation, intentional misrepresentation, fraudulent misrepresentation, and securities fraud under NRS 90.570. Regardless of the state of mind necessary, if any, to determine liability under appellants' various misrepresentation-based causes of action,[38] the essence of any misrepresentation claim is a false or misleading statement that

---

acted, did it manifest a clear intention to pervade the entire field of regulating clearing agencies so that any state law claims would be preempted. In light of the discussed provisions, Congress did not clearly manifest that intent.

[36]*See* 15 U.S.C. § 78q-1(a)(2)(A) and (B) (directing the Commission to "facilitate the establishment of a national system for the prompt and accurate clearance and settlement" of securities transactions, including registering and regulating clearing agencies).

[37]*Cf. Cipollone*, 505 U.S. at 524-30 (engaging in a claim-by-claim analysis to determine any express federal preemption of the state law causes of action in that case).

[38]*See Secretary of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001) (providing that scienter is not a required element of a cause of action under NRS 90.570 for securities fraud); *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382 (1998) (noting that one liable for negligent misrepresentation must have failed to exercise reasonable care with regard to the information communicated and that one liable for fraudulent misrepresentation generally must have communicated information knowing its falsity); *Collins v. Burns*, 103 Nev.

harmed appellants.[39] Moreover, in addressing appellants' misrepresentation claims in the context of this appeal from a district court order dismissing their complaint, this court assumes appellants' allegations are true[40]—*i.e.*, that respondents made the purported misrepresentations.

■■■ ■

Appellants contend that the NSCC, in its rules and procedures, falsely represents that it complies with a buying broker's notification to cure a selling broker's failure to deliver shares by purchasing them in the open market.[41] That representation is false, appellants contend, because the NSCC actually executes those buying broker requests through the Stock Borrow Program, not the open market.

Assuming the truth of that allegation—that the NSCC's rules and procedures represent that the NSCC executes buy-in requests by directly going to the open market, but in truth, the Commission-approved Stock Borrow Program is utilized so that the NSCC never goes to the open market—it appears inextricably entwined with an assertion that respondents have violated their own Commission-approved rules governing the Stock Borrow Program.[42] That is, appellants appear to assert that, by using the Stock Borrow Program, respondents do not act in accordance with their rules stating that they will fulfill the buying brokers' needs by going to the open market when so requested, even though the Stock Borrow Program is itself approved by the Commission.[43]

---

394, 741 P.2d 819 (1987) (noting that one liable for intentional (or fraudulent) misrepresentation generally must have communicated information knowing its falsity).

[39]*See* cases cited *supra* note 38.

[40]*See Breliant v. Preferred Equities Corp.*, 109 Nev. 842, 845, 858, P.2d 1258, 1260 (1993).

[41]*See* National Securities Clearing Corp., 46 Fed. Reg. 41,892 (Aug. 18, 1981).

[42]*Cf. United States Department of Agriculture v. Hunter*, 171 F.2d 793, 795 (5th Cir. 1949) (noting that, for sovereign immunity reasons, a governmental agency cannot be sued for carrying out its duties); *DL Capital Group v. Nasdaq Stock Market*, 409 F.3d 93, 97-98 (2d Cir. 2005) (recognizing that as the Commission would be absolutely immune from suit for carrying out its functions, self-regulatory organizations have similar immunity when acting under authority that the Commission delegated to them); *id.* at 98 (providing that "allegations of bad faith, malice, and even fraud . . . cannot, except in the most unusual of circumstances, overcome *absolute* immunity"). Indeed, appellants conceded at oral argument that, to the extent their claims implicate rule violations, they may be preempted.

[43]This is so even though, in appellants' opening brief, they state that "[t]he district court correctly observed that [appellants] 'have not alleged that the NSCC violated any rules governing [the Stock Borrow Program].' "

Appellants are, in essence, challenging the Commission-approved NSCC's rules' language, and thus, this claim is preempted for that reason.[44]

Appellants claim that respondents falsely represented, in the NSCC's rules and procedures manual, that the Stock Borrow Program satisfies delivery obligations by *borrowing* shares, since in reality those transactions constitute *sales*. Those transactions are sales, according to appellants, because when the NSCC delivers the borrowed shares to the buyer, the buyer acquires "all right, title[,] and interest in the shares." That allegation appears premised on NRS 104.8501(2)(a), which provides that when an entry crediting a broker's account is made, that broker acquires a securities entitlement. "Securities entitlement" is defined in NRS 104.8102(1)(p) as rights and property interest in a security.

Those provisions notwithstanding, the Commission, in registering the NSCC, expressly approved the NSCC's rules and procedures, including the NSCC's description of the Stock Borrow Program as a procedure involving borrowing shares. Thus, to the extent that NRS 104.8501(2)(a) would require respondents to represent that the Stock Borrow Program satisfies stock delivery obligations through sales of shares, enforcement of this statutory provision would make it impossible for the NSCC to comply with the Commission-approved rules and procedures, describing the program as using borrowed shares. The NSCC could comply with both provisions only by amending its Commission-approved rules. Thus, the district court did not err when it determined that appellants' claims based on this purported misrepresentation were preempted.

Appellants further assert a claim concerning respondents' representation with regard to the efficiency of the clearing and settling process. Appellants allege that respondents falsely represent that they efficiently clear and settle securities transactions, when, according to appellants, respondents allow a selling broker's commitment to deliver the total number of shares sold to remain unfulfilled for prolonged periods. According to appellants, allowing delivery commitments to remain unfulfilled for extended periods has negative market effects on those shares and artificially inflates

---

[44]*Cf. Barnett Bank of Marion Cty., N. A.*, 517 U.S. at 31-32 (recognizing that when state law prohibits what a federal enactment permits, the federal enactment overrides the state law). *See generally Bantum v. American Stock Exchange, LLC*, 777 N.Y.S.2d 137, 140 (App. Div. 2004) (noting that "the [Securities] Exchange Act [of 1934] establishes a scheme of regulation of the securities marketplace that combines self-regulation . . . with oversight and direct regulation by the [Commission]").

the number of shares issued and outstanding. This claim also is preempted.

First, while respondents represent that they efficiently clear and settle securities transactions—indeed, Congress directed the Commission to regulate clearing agencies for that purpose[45]—the degree of efficiency necessary to satisfy that directive is not federally defined. Imposing any state law requirement for efficiency, which, in the absence of any federal standard, would be necessary before appellants could show that respondents have failed to efficiently clear and settle securities transactions here, would compel respondents to alter their federally approved manner of operating the Stock Borrow Program. Therefore, this claim is preempted.[46]

Second, any negative market effects, artificial inflation of shares, or so-called phantom shares that result from respondents not clearing and settling securities transactions as expediently as appellants would prefer, would, it appears, constitute an exploitable flaw inherent in the federally authorized system, preempting state law challenges to that flaw.[47]

Finally, with respect to appellants' misrepresentation claims, appellants challenge respondents' representation regarding the number of shares that a lending broker actually retains in its DTC account after it has loaned shares of a given security. In essence, appellants contend that respondents' method of balancing the DTC and NSCC accounts and subaccounts created when a broker participates in the Stock Borrow Program overlooks the shares actually loaned and thus misrepresents the shares actually held by a lending broker in its DTC account. But like the previous allegation, respondents' method of balancing any accounts created while operating the Stock Borrow Program is a function of operating the Stock Borrow Program, a federally mandated and regulated system. Thus, this claim likewise is preempted.[48]

*Appellants' non-misrepresentation claims*

Appellants' remaining, non-misrepresentation claims include unfair trade practices in violation of NRS 598A.060, market manipulation in violation of NRS 90.580, conversion, intentional interference with contractual relations, breach of the implied covenant

---

[45]*See* 15 U.S.C. § 78q-1(a).

[46]*Crosby*, 530 U.S. at 373 (noting that federal law preempts state law when the state law poses an obstacle to the accomplishment of Congress's objectives and purposes).

[47]*Id.* (recognizing that a federal law overrides any state law that frustrates the federal law's operation within its intended field).

[48]*Id.*

of good faith and fair dealing, and conspiracy. Those claims are preempted, as their mere descriptions, set forth below, demonstrate that they manifestly attack either the federally regulated operation or existence of the Stock Borrow Program.

Specifically, appellants' contention that respondents engaged in unfair trade practices in violation of NRS 598A.060 challenges respondents' representation that the Stock Borrow Program efficiently clears and settles trades and asserts that respondents "have illegally tied the Stock Borrow Program to the separate and distinct functions of clearing and settling stock trades."

As regards appellants' NRS 90.580 market manipulation cause of action, appellants assert that, because respondents use the Stock Borrow Program as their predominate means of satisfying their share delivery obligations, instead of purchasing shares in the open market on a buying broker's notification, respondents conceal the demand for the stock of the company at issue. By concealing the demand for a company's stock, appellants assert, the market is misled concerning the demand for and value of that company's stock.

Appellants' conversion claim, as with one of the misrepresentation allegations above, alleges that the Stock Borrow Program does not involve borrowing, but rather creates a security entitlement. Because the Stock Borrow Program creates securities entitlements when Nanopierce shares are loaned, appellants contend, an actual sale is taking place and unauthorized, wrongful dominion is exercised over those shares.

Appellants' intentional interference with contractual relations claim asserts that operating the Stock Borrow Program interferes with Nanopierce's contractual relationships, based on its articles of incorporation, with its shareholders.

Appellants' claim for breach of the implied covenant of good faith and fair dealing alleges that, to the extent Nanopierce shares constitute a contract, the DTC, which holds those shares in its vaults in the name of its nominee, does not act in good faith with respect to those shares when placing them in the Stock Borrow Program.

Concerning appellants' conspiracy claim, they contend that respondents have conspired to use the Stock Borrow Program to manipulate and dilute Nanopierce's stock value.[49]

As set forth above, these non-misrepresentation claims overtly challenge the Stock Borrow Program and respondents' federally

---

[49]Notably, because respondents are a parent company and its subsidiaries, they have no separate legal existence; thus it appears "impossible for a civil conspiracy to have occurred." *Laxalt v. McClatchy*, 622 F. Supp. 737, 745-46 (D. Nev. 1985) (citing *Corbit v. J. I. Case Company*, 424 P.2d 290, 295 n.3 (Wash. 1967)); *see also Collins v. Union Fed. Savings & Loan*, 99 Nev. 284, 662 P.2d 610 (1983) (recognizing that a corporation's agents or employees acting in their official capacities generally cannot conspire with the corporation).

regulated operation of it. Therefore, those claims, like the misrepresentation-based claims, are preempted.[50]

## CONCLUSION

Given the Securities Exchange Act's framework and provisions, in particular section 17A, any intent of Congress to occupy the legislative field of clearing and settling securities transactions is not "clear and manifest." Room exists for state laws to supplement that federal regulatory scheme, so long as any such state laws do not actually conflict with the federal law with respect to clearing and settling securities transactions. The question whether section 17A of the Securities Exchange Act and any regulations promulgated thereto—to the extent they concern clearing and settling securities transactions—preempt state law claims therefore turns on whether a party's compliance with both state and federal law requirements is impossible, or whether the Securities Exchange Act's purpose would be frustrated if state law applied.

Here, measuring appellants' state law claims against the Securities Exchange Act's framework with respect to clearing and settling securities transactions, and the federal statute's effects and purpose to allow the Commission to regulate and control a national system for clearing and settling securities transactions, reveals that appellants' claims conflict with Congress's regulatory scheme. That is, imposing the requirements implicated by appellants' state law claims, which they primarily base on allegations that respondents conceal flaws in a Commission-approved national system for clearing and settling securities transactions, frustrates Congress's objectives with respect to the clearing and settling regulatory scheme and renders adherence to both that regulatory scheme and state law impossible. Federal law thus preempts appellants' claims. Accordingly, as all of appellants' causes of action are preempted by federal enactments in the area of clearing and settling securities transactions, we conclude that the district court did not err in dismissing appellants' amended complaint, and we thus affirm the district court's order.

MAUPIN, C. J., GIBBONS, PARRAGUIRRE and CHERRY, JJ., concur.

HARDESTY, J., with whom DOUGLAS, J., agrees, concurring in part and dissenting in part:

The majority correctly determines that no field preemption exists in the general area of securities regulation and the specific area

---

[50]See generally Dahl v. Charles Schwab & Co., Inc., 545 N.W.2d 918, 926 (Minn. 1996) (recognizing that, given "the national import and possible effect of" any state law-based decision on a particular securities procedure, such decisions "are for the SEC and Congress").

of clearing and settling securities transactions. I agree, moreover, with much of the majority's analysis regarding conflict preemption, which, as the majority notes, generally examines whether a party's compliance with both state and federal requirements is impossible or whether, in light of the federal law's purpose and intended effects, state law poses an obstacle to congressional objectives.[1] But in concluding, in light of such an examination, that all of appellants' state law causes of action conflict with federal law for a national system of clearing and settling securities transactions, the majority mischaracterizes appellants' allegation that the NSCC, in its rules and procedures, misrepresents that it complies with a buying broker's notification—*i.e.*, buy-in request—to cure a selling broker's failure to deliver shares by purchasing them in the open market, when instead, the NSCC utilizes the Stock Borrow Program. Thus, although I agree with the majority that federal law preempts most of appellants' claims, I would reverse the district court's order with respect to appellants' four causes of action based on that alleged misrepresentation and remand this matter for further proceedings.

The majority characterizes appellants' buy-in-request-based allegation as attacking the language of an NSCC, Commission-approved rule, which, if that characterization were accurate, unquestionably would be preempted. But that characterization is not accurate. Appellants specifically allege that respondents "misrepresented" to them that unsatisfied share delivery commitments would, on a broker's buy-in request, be cured by purchasing the necessary shares on the open market, when in fact, those unfulfilled obligations are "actually cured by borrowing shares from lending [brokers] through the Stock Borrow Program." In that allegation, appellants are not directly challenging any NSCC rule's language, but rather that respondents represent that they satisfy buy-in requests by purchasing shares in the open market, while instead using the Stock Borrow Program to satisfy buy-in requests. Determining whether respondents are liable on state law grounds for inaccurately representing how they executed buying brokers' notifications to purchase shares on the open market is not inconsistent with the Commission's approval of the Stock Borrow Program or the NSCC's rules, even if it indirectly causes respondents to choose whether to change those rules or face potential additional lawsuits.[2]

Indeed, it does not appear impossible for respondents to comply with Nevada's misrepresentation jurisprudence by accurately stat-

---

[1] *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000).

[2] *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005) (providing that "[a] requirement is a rule of law that must be obeyed; an event . . . that merely motivates an optional decision is not a requirement").

ing how notifications to purchase shares on the open market are executed while simultaneously complying with federal law controlling a national system for clearing and settling securities transactions. Nor does any such compliance appear to frustrate the accomplishment of Congress's objectives with respect to that regulatory scheme.

Therefore, as appellants' buy-in-request-based allegation does not conflict with federal law controlling a national system for clearing and settling securities transactions, I would reverse the district court's order with respect to appellants' causes of action based on that allegation and remand this matter for further proceedings.

