ROLF JENSEN & ASSOCIATES, INC., Petitioner, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for THE COUNTY OF CLARK; and THE HONORABLE ELISSA F. CADISH, District Judge, Respondents, and MANDALAY CORPORATION, Real Party in Interest.

No. 57461

August 9, 2012 282 P.3d 743

[Rehearing denied October 16, 2012]

*Weil & Drage, APC*, and *Jean A. Weil, John T. Wendland*, and *Thomas A. Larmore*, Henderson, for Petitioner.

*Cotton, Driggs, Walch, Holley, Woloson & Thompson* and *Dennis R. Haney*, Las Vegas; *Jones Day* and *Clark T. Thiel*, San Francisco, California, for Real Party in Interest.

*Backus, Carranza & Burden* and *Leland Eugene Backus* and *Shea A. Backus*, Las Vegas; *Lloyd, Gray, Whitehead & Monroe, PC*, and *E. Britton Monroe* and *R. Burns Logan*, Birmingham, Alabama, for Amicus Curiae Halcrow, Inc.

*Watt, Tieder, Hoffar & Fitzgerald, LLP*, and *David R. Johnson* and *Jared M. Sechrist*, Las Vegas, for Amicus Curiae Tishman Construction Corporation of Nevada.

*Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, and *Michael M. Edwards, J. Scott Burris*, and *Chad C. Butterfield*, Las Vegas, for Amicus Curiae Converse Professional Group.

## OPINION

By the Court, SAITTA, J.:

In this original petition for a writ of mandamus, we are asked to consider whether the Americans with Disabilities Act of 1990 (ADA) preempts state law claims for indemnification brought by an admitted violator of the ADA. After examining the purpose and intended effects of the ADA, we conclude that such claims pose an obstacle to the objectives of the ADA and therefore are preempted. Accordingly, we grant the petition.

### FACTS

In 2002, real party in interest Mandalay Corporation entered into a contract with petitioner Rolf Jensen & Associates, Inc., whereby Rolf Jensen would provide consulting services regarding construction of an expansion to the Mandalay Bay Resort and Casino (the Resort) in Las Vegas in compliance with the ADA. The parties' contract contained a provision providing that Rolf Jensen would indemnify Mandalay for any damages arising from any act, omission, or willful misconduct by Rolf Jensen in its performance of its obligations. After the Resort expansion was constructed, the Department of Justice (DOJ) began an investigation of numerous violations of the ADA arising from a lack of handicap

accessibility at the Resort. Thereafter, Mandalay entered into a comprehensive settlement agreement with the DOJ that required Mandalay to bring the Resort into compliance with the ADA. Mandalay estimates that these retrofits will cost it more than $20 million.

Mandalay subsequently sued Rolf Jensen in district court, seeking to recover the costs it will incur to retrofit the Resort. After preliminary motion practice, the following claims remained pending against Rolf Jensen: (1) express indemnification, (2) breach of contract, (3) breach of express warranty, and (4) negligent misrepresentation. Rolf Jensen filed a motion for summary judgment, asserting that these claims are each preempted by the ADA and that, alternatively, Mandalay's claim for negligent misrepresentation is barred by the economic loss doctrine. The district court denied Rolf Jensen's motion for summary judgment. Rolf Jensen now petitions this court for a writ of mandamus directing the district court to grant its motion.

## DISCUSSION

Rolf Jensen maintains that the district court was required to grant its motion for summary judgment because Mandalay's claims are each preempted by the ADA and, in addition, Mandalay's negligent misrepresentation claim is barred by the economic loss doctrine. Rolf Jensen contends that consideration of its petition is appropriate given the important questions of law involved and notions of judicial economy.

''A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station or to control an arbitrary or capricious exercise of discretion.'' *International Game Tech. v. Dist. Ct.*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008) (citations omitted); NRS 34.160. ''Writ relief is not available, however, when an adequate and speedy legal remedy exists'' and, as we have explained, an appeal generally constitutes a sufficient remedy. *International Game Tech.*, 124 Nev. at 197, 179 P.3d at 558; NRS 34.170. The issue of whether an appeal is an adequate and speedy remedy ''necessarily turns on the underlying proceedings' status, the types of issues raised in the writ petition, and whether a future appeal will permit this court to meaningfully review the issues presented.'' *D.R. Horton v. Dist. Ct.*, 123 Nev. 468, 474-75, 168 P.3d 731, 736 (2007). Even when an appeal is not an adequate and speedy remedy, we typically will not entertain writ petitions challenging the denial of a motion for summary judgment unless ''no factual dispute exists and summary judgment is clearly required by a

statute or rule, or an important issue of law requires clarification." *Walters v. Dist. Ct.*, 127 Nev. 723, 727, 263 P.3d 231, 234 (2011).

Here, an appeal is not a speedy or adequate remedy in light of the relatively early stages of litigation and considerations of sound judicial administration. Next, the issue of preemption under the ADA is an issue of nationwide magnitude in need of clarification in the courts of this state. Accordingly, we exercise our discretion to entertain this writ petition.

*Preemption*

Whether state law claims are preempted by federal law is a question of law that we review de novo, without deference to the findings of the district court. *Nanopierce Tech. v. Depository Trust*, 123 Nev. 362, 370, 168 P.3d 73, 79 (2007). The preemption doctrine emanates from the Supremacy Clause of the United States Constitution, pursuant to which state law must yield when it frustrates or conflicts with federal law. *Id.* The doctrine is comprised of two broad branches: express and implied preemption. *Id.* Express preemption occurs, as its name suggests, when Congress "explicitly states that intent in a statute's language." *Id.* at 371, 168 P.3d at 79. Implied preemption arises, in contrast, "[w]hen Congress does not include statutory language expressly preempting state law." *Id.*

Implied preemption contains two sub-branches: field and conflict preemption. *Id.* Field preemption applies "when congressional enactments so thoroughly occupy a legislative field, or touch a field in which the federal interest is so dominant, that Congress effectively leaves no room for states to regulate conduct in that field." *Id.* Conflict preemption, or obstacle preemption, as it is oftentimes called, occurs when "federal law actually conflicts with any state law." *Id.* at 371, 168 P.3d at 80. As we have explained:

> Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives.

*Id.* at 371-72, 168 P.3d at 80.

This petition involves conflict preemption. More precisely, this petition concerns whether, in view of the ADA's purpose and intended effects, Mandalay's state law claims pose an obstacle to the accomplishment of Congress's objectives in enacting the ADA.

As a threshold matter, we note that the United States Supreme Court has set forth "two cornerstones" of preemption that we must factor into our analysis of this issue. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). First, the Court has explained that " 'the purpose of Congress is the ultimate touchstone in every preemption case.' " *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Second, the Court has instructed that " '[i]n all preemption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* (alterations in original) (quoting *Lohr*, 518 U.S. at 485). The second principle, known as the presumption against preemption, arises out of "respect for the States as 'independent sovereigns in our federal system.' " *Id.* at 565 n.3 (quoting *Lohr*, 518 U.S. at 485).

This writ petition involves Congress's legislation in the area of disability discrimination. Although states have the "police powers to prohibit discrimination on specified grounds," *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005), historically states have, at best, played a junior role in this area. *See Alexander v. Choate*, 469 U.S. 287, 295-96 (1985) (explaining that Congress enacted provisions prohibiting discrimination against disabled persons precisely because such persons had otherwise been neglected). Thus, because this petition does not involve a legislative landscape traditionally occupied by the states, the presumption against preemption does not apply with particular force here. *See Wyeth*, 555 U.S. at 565 n.3 (noting that the force given to the presumption against preemption is guided by "the historic presence of state law"). With these overarching principles in mind, we consider the purpose and intended effects of the ADA.

### The ADA

In enacting the ADA, Congress declared:

> It is the purpose of this chapter—
> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
> (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
> (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
> (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to

regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b) (2006).

Thus, the goal of the ADA is twofold. It is intended not only to remedy discrimination against disabled individuals but to prevent it. "To effectuate its sweeping purpose," the ADA has a comprehensive scope covering discriminatory practices that disabled persons face "in major areas of public life," including access to public accommodations. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). But Congress was not simply concerned with intentional discrimination when it enacted the ADA. It also specifically designed the provisions of the ADA to prevent discrimination stemming from neglect and indifference. *See id.* As such, regardless of the intent of an owner of a place of public accommodation, when, as here, a facility is not constructed to be readily accessible to individuals with disabilities, the owner is liable for unlawful discrimination. *See* 42 U.S.C § 12182(a) (2006) (prohibiting the discrimination against disabled individuals "in the full and equal enjoyment of . . . facilities . . . or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation"); 42 U.S.C. § 12183(a)(1) (2006) (explaining that "discrimination" for purposes of the ADA includes "a failure to design and construct facilities for first occupancy . . . that are readily accessible to and usable by individuals with disabilities"). Notably, however, with the exception of landlord-tenant relationships, 28 C.F.R. § 36.201(b) (2010), there are no provisions within the ADA, or its accompanying regulations, that permit indemnification or the allocation of liability between the various entities subject to the ADA.

### Mandalay's indemnification claim

Having examined the germane aspects of the ADA, we now turn to the parties' specific arguments with respect to whether Mandalay's state law claims are preempted by the ADA. Regarding Mandalay's indemnification claim, Rolf Jensen argues that such claims are preempted because they diminish owners' incentive to comply with the ADA, thereby frustrating Congress's goal of preventing disability discrimination.

Mandalay responds that its indemnification claim, in fact, advances the purpose of the ADA. Specifically, it argues that if owners of places of public accommodation are able to seek indemnification from ADA consultants, such as Rolf Jensen, then they will be more inclined to hire these consultants, which have the overall effect of promoting ADA compliance. Mandalay also asserts that it would simply be unfair to preempt its indemnification claim and force it to bear the cost of retrofitting the Resort, while Rolf Jensen, who was a direct factor in causing these expenses, escapes

responsibility. Finally, Mandalay contends that enforcing the parties' indemnification provision does not interfere with the purpose of the ADA because it does not deprive disabled persons the right to seek relief for violations of the ADA.

Courts in other jurisdictions have "flatly rejected" the type of indemnification claim brought by Mandalay. *See* 1 John P. Relman, *Housing Discrimination Practice Manual* § 2:9 (2011). The leading case in this regard is *Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597 (4th Cir. 2010). In *Niles Bolton*, the United States Court of Appeals for the Fourth Circuit reasoned that permitting an owner to, in essence, circumvent responsibility for its violations of the ADA and the Fair Housing Act (FHA) through an indemnification claim would lessen the owner's incentive to ensure compliance with the ADA and FHA.[2] *Id.* at 602. The court therefore concluded that such claims are preempted:

> Allowing an owner to completely insulate itself from liability for an ADA or FHA violation through contract diminishes its incentive to ensure compliance with discrimination laws. If a developer . . . , who concededly has a non-delegable duty to comply with the ADA and FHA, can be indemnified under state law for its ADA and FHA violations, then the developer will not be accountable for discriminatory practices . . . . Such a result is antithetical to the purposes of the FHA and ADA.

*Id.*

Likewise, the federal district courts that have considered this issue have each uniformly concluded that owners' indemnification claims for their own ADA violations undermine the goals of the ADA. *See United States v. The Bryan Co.*, No. 3:11-CV-302-CWR-LRA, 2012 WL 2051861, at *5 (S.D. Miss. Jun. 6, 2012) (permitting indemnification claims for violations of the ADA or FHA "would frustrate, 'disturb, interfere with, or seriously compromise the purposes of the' FHA and ADA" (quoting *Morgan*

---

[2]Notwithstanding Mandalay's criticisms, this view of indemnification claims has long been embraced by courts, in various statutory contexts. *See, e.g.*, *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986) (state indemnification actions against supervisory personnel by employers who have been sued for violations of the Fair Labor Standards Act (FLSA) are preempted because "an employer who believed that any violation of the [FLSA] could be recovered from its employees would have a diminished incentive to comply with the statute and might be inclined to close its eyes [to violations of the FLSA]"); *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir. 1980) (permitting indemnification for violations of the Securities Act of 1933 "would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence").

*City v. South Louisiana Elec. Co-Op.*, 31 F.3d 319, 322 (5th Cir. 1994))); *Equal Rights Center v. Archstone Smith Trust*, 603 F. Supp. 2d 814, 824 (D. Md. 2009) (''[I]ndemnification is antithetical to Congress' purpose in enacting the FHA and the ADA.''); *United States v. Murphy Development, LLC*, No. 3:08-0960, 2009 WL 3614829, at *2 (M.D. Tenn. Oct. 27, 2009) (''[A]llowing recovery under state law for indemnity and/or contribution would frustrate the achievement of Congress' purposes in adopting the FHA and the ADA.'').

We agree with these courts that permitting indemnification claims would weaken owners' incentive to prevent violations of the ADA and therefore would conflict with the ADA's purpose and intended effects. Simply put, such claims would allow owners to contractually maneuver themselves into a position where, in essence, they can ignore their nondelegable responsibilities under the ADA. As previously noted, eliminating this type of neglectful environment was one of the specific aims of Congress in enacting the ADA. It follows that if owners were permitted to pursue indemnification for their own ADA violations, Congress's goal of preventing discrimination would be frustrated. In addition, such claims would intrude upon the remedial scheme set forth in the ADA, which, we reiterate, does not provide for a right to indemnification, despite having a sweeping and comprehensive scope. *See Access 4 All, Inc. v. Trump International Hotel and Tower Condominium*, No. 04-CV-7497KMK, 2007 WL 633951, at *7 (S.D.N.Y. Feb. 26, 2007) (examining New York state law and explaining that even if it provided for a right to indemnity for a party's own ADA violations, ''it would raise the specter that any state-law right to indemnity would be pre-empted by the extensive remedial scheme of the ADA'') . Thus, as Rolf Jensen argues, and as every court to squarely consider this issue has held,[3] the ADA preempts indemnification claims brought by owners for their violations thereof because such claims would pose an obstacle to the ADA.

With respect to Mandalay's assertion that permitting indemnification claims would have the overall effect of promoting ADA compliance by encouraging owners to seek advice from ADA consultants, we disagree. Owners are motivated to seek this advice to

---

[3]The only authority critical of this view is a law review note. *See* Charles Daugherty, Note, *Who Needs Contract Law?—A Critical Look at Contractual Indemnification (or Lack Thereof) in FHAA and ADA ''Design and Construct'' Cases*, 44 Ind. L. Rev. 545, 547 (2011). As with the arguments advanced by Mandalay, we find the analysis contained in this authority unpersuasive.

aid in *their* duty to construct facilities in compliance with the ADA; indeed, that is the very point of seeking such assistance. Mandalay's suggestion that owners only contract with these consultants in order to obtain indemnification understates the role qualified consultants play in owners' efforts to meet ADA requirements. Moreover, the debilitating effect that such a mindset has on ADA compliance, as dramatically illustrated by the numerous violations of the ADA in this case, is palpable. As previously explained, the surest way to maximize compliance with the ADA is to hold owners' risks of noncompliance firmly in place.

We also disagree with Mandalay's contention that it is simply unfair to preempt its indemnification claim. In today's commercial construction industry, it is surely an owner such as Mandalay—a highly sophisticated entity with ultimate authority over all construction decisions—who is in the best position to prevent violations of the ADA. Furthermore, contrary to Mandalay's contention, Rolf Jensen is not immunized from liability for the role that it allegedly played in Mandalay's violations of the ADA. Rolf Jensen's liability, however, simply runs to disabled individuals rather than to Mandalay. *See Archstone Smith*, 603 F. Supp. 2d at 824 (any entity who contributes to a violation of the ADA may be directly liable); *U.S. v. Days Inns of America, Inc.*, 997 F. Supp. 1080, 1083 (C.D. Ill. 1998) ("[A]rchitects, builders, [and] planners," among others, are within the ADA's "broad sweep of liability.").

Mandalay is correct that its indemnification claim does not directly interfere with the rights of disabled individuals to obtain relief under the ADA. Mandalay overlooks, however, that the goal of the ADA is not simply to remedy discrimination against individuals with disabilities but to prevent it in the first place. *See* 42 U.S.C. § 12101(b) (2006). Thus, although Mandalay's indemnification claim may not interfere with the remedial components of the ADA, as detailed above, it thwarts the prophylactic aspects of the ADA.

Mandalay has not cited any case that has directly addressed this issue and concluded that claims for indemnification are not preempted by the ADA. The only decision cited by Mandalay to arguably indicate that such claims might be viable is *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 755 (D. Or. 1997), wherein the court stated that an owner and architect responsible for violations of the ADA "can decide later, as between themselves, who will be responsible for any costs that [the owner] may incur as a result . . . ." Mandalay seizes on this statement, arguing that the remark shows that indemnification claims are permitted. But *Oregon Arena* is not so broad. The court was

simply commenting on a possible dispute between the owner and the architect. In fact, the architect was not a party to the dispute that the court was considering. *Id.* And, to the extent it can be said that *Oregon Arena* speaks to the question at issue here, the court cited no authority and provided no analysis of preemption; thus, Mandalay's reliance on *Oregon Arena* is misplaced.

Mandalay also cites to 28 C.F.R. § 36.201(b) (2010), which provides, in pertinent part, that "allocation of responsibility for complying with the obligations of [the ADA]" is permitted between landlords and tenants. Despite the selective quotations of this regulation in Mandalay's briefs, by its plain language, this provision only applies in the landlord-tenant context. The inclusion of a right to indemnification for landlords and tenants undermines Mandalay's argument because the regulation's omission of other entities appears intentional. *See Matter of Estate of Prestie*, 122 Nev. 807, 814, 138 P.3d 520, 524 (2006) (recognizing the general rule of construction that when one thing is mentioned the exclusion of another is implied). Equally misguided is Mandalay's reliance on decisions that have cited this regulation in concluding that indemnification is permitted between landlords and tenants. *See, e.g.*, *Botosan v. Paul McNally Realty*, 216 F.3d 827, 834 (9th Cir. 2000). As the Fourth Circuit Court of Appeals has explained, "[t]he history of [28 C.F.R. § 36.201(b)] demonstrates that this allocation provision is unique to the landlord-tenant relationship and does not impact the relationships between architects, builders, and other parties." *Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597, 602 n.1 (4th Cir. 2010).

The remaining authorities cited by Mandalay are distinguishable. Mandalay relies upon *Meyer v. Holley*, 537 U.S. 280, 285 (2003), where the Supreme Court stated that an action brought under the FHA "is, in effect, a tort action," and that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." Mandalay also cites *Norfolk & Western R. Co. v. Ayers*, 538 U.S. 135, 162 (2003), where the Court indicated that an employer liable under the Federal Employers' Liability Act may seek contribution or indemnification from concurrently liable third parties in accordance with the traditional principles of tort law. Mandalay argues that the ADA essentially creates tort liability and, because indemnification is a traditional principle of tort law, Congress intended for the ADA to incorporate the right to such relief. But neither *Meyer* nor *Norfolk* involved preemption, much less the specific issue of preemption by the ADA, and we are aware of no case that has cited these decisions for the proposition advanced by Mandalay. Also unpersuasive

is Mandalay's reliance on *American Federal Savings v. Washoe County*, 106 Nev. 869, 875-76, 802 P.2d 1270, 1275 (1990), where this court concluded that a third-party tortfeasor's contractual right to express indemnification from an employer based upon an employee's injury was not voided by Nevada's workers' compensation scheme. As with *Meyer* and *Norfolk*, *American Federal* is distinguishable because it did not concern preemption by the ADA. In sum, the few authorities that Mandalay has patched together in support of its position are unavailing. Therefore, we conclude that Mandalay's indemnification claim is preempted by the ADA.

### Mandalay's remaining state law claims

Rolf Jensen also argues that Mandalay's claims for breach of contract, breach of express warranty, and negligent misrepresentation are preempted by the ADA because, in substance, these claims are merely a reiteration of Mandalay's claim for indemnification.

Mandalay responds that it does not simply seek indemnification through these claims. Rather, it contends that it seeks separate and distinct relief for Rolf Jensen's breach of its contractual and professional obligations to provide advice that would prevent violations of the ADA.

*Niles Bolton* is instructive on this issue. There, the Fourth Circuit held that although an owner may attempt to plead an indemnification claim in the garb of breach of contract and negligence theories, when the relief the owner seeks is recovery of all the losses arising from its violations of the ADA and FHA, such claims are "*de facto* indemnification claims and, thus, preempted." 602 F.3d at 602; *see also Equal Rights Center v. Archstone Smith Trust*, 603 F. Supp. 2d 814, 824 (D. Md. 2009) (concluding that claims for breach of contract and professional negligence were preempted where they were "wholly derivative of [the owner's] primary liability" under the ADA and FHA).

Like these courts, in resolving the issue of whether state law claims are preempted by federal law, we analyze their substance, not simply their labels. *See, e.g.*, *Cervantes v. Health Plan of Nevada*, 127 Nev. 789, 793 n.4, 263 P.3d 261, 264 n.4 (2011) (although a party may plead different theories, claims based upon the same substantive allegations "necessarily stand or fall together" when considering whether they are preempted). Consequently, if, as Rolf Jensen asserts, Mandalay's claims for breach of contract, breach of express warranty, and negligent misrepresentation are simply a subterfuge for Mandalay's indemnification claim, then those claims are preempted by the ADA.

A close reading of Mandalay's third amended complaint reveals that each of its claims and requested damages derive solely from its first-party liability for its admitted violations of the ADA. While Mandalay argues that its claims have an independent basis, what Mandalay seeks to recover, and what each of its claims are predicated upon, is the cost of retrofitting the Resort as required by its settlement with the DOJ. Indeed, were it not for this settlement, Mandalay would not have brought these claims against Rolf Jensen in the first place. Accordingly, we conclude that Mandalay's claims for breach of contract, breach of express warranty, and negligent misrepresentation are de facto claims for indemnification and thus are preempted by the ADA.[4]

## CONCLUSION

We conclude that Mandalay's state law claims for indemnification pose an obstacle to the objectives of the ADA and therefore are preempted.[5] Accordingly, we grant Rolf Jensen's petition for extraordinary relief and direct the clerk of this court to issue a writ of mandamus instructing the district court to grant Rolf Jensen's motion for summary judgment.[6]

CHERRY, C.J., and DOUGLAS, GIBBONS, HARDESTY, and PARRAGUIRRE, JJ., concur.

---

[4]We have considered Mandalay's remaining contentions and conclude that they are without merit.

[5]In view of our disposition, we need not address whether Mandalay's negligent misrepresentation claim is also barred by the economic loss doctrine.

[6]In light of this opinion, we vacate the stay ordered by this court on July 20, 2011.