# Illinois Official Reports

## Appellate Court

---

*Chicago Housing Authority v. DeStefano & Partners, Ltd.*,
2015 IL App (1st) 142870

---

| | |
|---|---|
| Appellate Court Caption | THE CHICAGO HOUSING AUTHORITY, Plaintiff-Appellant, v. DeSTEFANO AND PARTNERS, LTD., Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-14-2870, 1-15-3040 cons. |
| Filed<br>Rehearing denied | December 11, 2015<br>January 19, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-8376; the Hon. Ronald Bartkowicz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Donohue Brown Mathewson & Smyth LLC (Karen Kies DeGrand and Meagan P. VanderWeele, of counsel) and Corboy & Demetrio, P.C. (Rene A. Torrado, Jr., of counsel), both of Chicago, for appellant.<br><br>Vanek, Vickers & Masini, P.C., of Chicago (Jon B. Masini, Scott A. Ruksakiati, and Nathan O. Hadsell, of counsel), for appellee. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Gordon concurred in the judgment and opinion. |

¶ 1        Plaintiff, the Chicago Housing Authority (CHA), appeals the circuit court's order dismissing one of its breach of contract claims against defendant, DeStefano and Partners, Ltd. (DeStefano). CHA contends the circuit court erred in dismissing its state-law breach of contract claim where it incurred substantial costs to bring a rehabilitation project within compliance of federal fair housing and accessibility laws as a result of defendant's failure to perform under the terms of the parties' contract. Based on the following, we affirm.

¶ 2                                            FACTS

¶ 3        In 1999, CHA launched a 10-year plan to update its public housing known as the "Plan for Transformation." The project was funded by the United States Department of Housing and Urban Development (HUD). In 2000, HUD provided CHA conditional approval for a prescribed period of five years during which time CHA was to take certain actions to ensure it could adequately meet the needs of the disabled. In relevant part, CHA planned its overall renovations to meet the requirements of section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 (1994)) (Section 504) by constructing 5.3% of its units to accommodate mobility impaired individuals and 2.1% of its units to be accessible to individuals with sensory impairments.[1] In an effort to accomplish its goals, CHA was required to conduct a Section 504 self-evaluation.

¶ 4        On July 14, 2000, the parties entered into a CHA standard agreement for prime design consulting services (initial design contract), under which defendant agreed to provide professional architectural and engineering services for seven multifamily residential buildings owned and operated by CHA. Pursuant to the initial design contract, defendant was "responsible for providing, or causing to be provided under its direct supervision and control, all professional Architecture, Engineering and Construction Consulting related services." The parties agreed to amend and restate their agreement, on November 18, 2004, by entering into a professional architecture/engineering services agreement (restated design contract). The restated design contract provided that defendant's basic services under the agreement were "to provide complete architectural and engineering services in connection with the Project as are usually and customarily performed, rendered or done by architects preliminary to and in connection with the preparation of plans, designs and specifications and the construction, rehabilitation and completion of residential buildings." The restated design contract further provided that defendant:

          "shall certify that all work was performed under the direct supervision of the Project Architect and that it conforms to the Chicago Building Code, as amended, the Illinois Accessibility Code, as amended, all applicable Federal, State and local building codes, as amended, including, but not limited to, the Uniform Federal Accessibility Standards, the American with Disabilities Act of 1990 [(ADA) (42 U.S.C. § 12101 *et seq*. (2000))], as amended, Section 504 of the Rehabilitation Act of 1973, as amended and as implemented in 24 CFR Part 8 and the Fair Housing Act Design

_____
[1]Only units that met the requirements of the Uniform Federal Accessibility Standards (UFAS) would count toward the Section 504 quotas.

Manual, and the design and construction requirements of the U.S. Department of Housing and Urban Development."

¶ 5 Meanwhile, in August 2003, after construction of the project had begun, HUD notified CHA of its plans to conduct a Section 504 and ADA compliance review. In a letter dated September 30, 2004, HUD issued its preliminary findings of noncompliance with Section 504 and Title II of the ADA (preliminary noncompliance letter) detailing a range of deficiencies both major and minor. The letter did not contain any reference to a CHA violation in terms of compliance with the required percentages established by Section 504 where the project was still ongoing. The preliminary noncompliance letter, however, did state that resolution of the identified violations would be described in a forthcoming written plan called a voluntary compliance agreement. Moreover, the letter indicated that future compliance would be assessed and certified by a third-party independent architectural consultant.

¶ 6 Defendant completed its work on the buildings in 2004.

¶ 7 On June 8, 2006, HUD and CHA executed a negotiated voluntary compliance agreement, providing, in relevant part, CHA with obligations to correct the purported deficiencies identified in the preliminary noncompliance letter and to fulfill its responsibilities of complying with, *inter alia*, the federal accessibility standards set forth in Section 504 and Title II of the ADA. The agreement contained no findings of liability against CHA and no penalty was charged to CHA. In November 2006, CHA hired a new architecture firm to perform the work necessary to comply with its obligations under the voluntary compliance agreement. According to CHA, it incurred over $4.3 million to bring the seven buildings into compliance with the federal accessibility standards.

¶ 8 On May 29, 2009, CHA filed a two-count amended complaint against defendant asserting causes of action for breach of contract and indemnity. In its breach of contract claim, CHA alleged defendant "materially breached" the parties' agreement by, *inter alia*, failing to "report that the rehabilitation and renovation work performed *** did not conform to the requirements of applicab[le] federal laws, regulations and guidelines," including Section 504 and the ADA. CHA further alleged that defendant "failed to provide accurate certifications that the project work *** conformed to, among other things, the Uniform Federal Accessibility Standards, the Americans with Disabilities Act of 1990, as amended, Section 504 of the Rehabilitation Act of 1973, as amended and implemented in 24 C.F.R. Part 8 and the Fair Housing Act Design Manual, and the design and construction requirements of the U.S. Department of Housing and Urban Development, when, in fact, the project work did not conform to such standards and requirements." CHA sought damages in the form of expenses and costs incurred to bring the project in conformance with the applicable state and federal laws, regulations, and guidelines. In response, defendant filed a motion for partial summary judgment asserting that CHA had a nondelegable duty to comply with the federal accessibility standards and that the costs incurred by CHA to correct the accessibility violations were not recoverable from defendant under its state-law breach of contract action.

¶ 9 In an order dated June 21, 2012, the circuit court held that CHA's breach of contract claim could be considered only to the extent that the claim did not seek to recover losses related to defendant's noncompliance with Section 504 and the ADA. The circuit court ordered the parties to submit supplemental briefs explaining what damages sought by CHA were unrelated to the noncompliance with Section 504 and the ADA. On January 14, 2013,

the circuit court granted defendant's motion for partial summary judgment on both counts of the amended complaint, finding "to the extent that CHA seeks recovery from DeStefano for costs arising out of or relating to any alleged violations of applicable federal handicap accessibility regulations as such claims are preempted and barred by federal law." The circuit court, however, added that claims that were unrelated to violations of applicable handicap accessibility regulations were not barred. On May 22, 2013, the circuit court subsequently denied CHA's motion for reconsideration.

¶ 10       On August 21, 2013, CHA filed its second amended complaint, alleging two counts of breach of contract and one count of contractual indemnity. CHA separated its breach of contract claims wherein one related to defendant's failure to perform its contractual obligations in conformance with the federal accessibility standards (count I) and one related to defendant's failure to perform its contractual obligations unrelated to the federal accessibility standards (count II). In response, defendant filed a motion to dismiss count I and portions of count II pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2012)) based on federal preemption principles. On February 26, 2014, in a written order, the circuit court granted defendant's motion, dismissing count I and count II, but allowed CHA to replead count II to eliminate any allegations or claims for losses related to noncompliance with federal handicap accessibility standards. In so doing, the circuit court noted that CHA's count I was "significant[ly] similar" to the breach of contract allegation in its amended complaint for which summary judgment was granted in favor of defendant. Citing *Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597 (4th Cir. 2010), for support, the circuit court expressly stated that CHA could not contractually delegate its duty to comply with the federal accessibility standards.

¶ 11       On March 28, 2014, CHA filed a three-count third amended complaint against defendant, the subject of which underlies the current appeal. In count I, CHA alleged breach of contract related to defendant's failure to perform its professional services in conformance with the federal accessibility standards, which resulted in damages in excess of $4.3 million to CHA for amounts paid to professionals and contractors for the additional work required to meet those federal accessibility standards. In count II, CHA alleged breach of contract unrelated to the federal accessibility standards. In count III, CHA requested indemnity related to a lawsuit brought against CHA by a third-party general contractor. Defendant responded by filing a section 2-619 motion to dismiss count I of the third amended complaint, asserting that the circuit court had entered prior orders barring CHA from maintaining a *de facto* claim for indemnity for the losses caused by noncompliance with Section 504 and the ADA. On June 24, 2014, the circuit court granted defendant's motion, and dismissed count I of CHA's third amended complaint with prejudice "[f]or the reasons set forth in the January 14, 2013, and February 26, 2014, orders." On August 25, 2014, the circuit court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), finding there was no just reason for delaying an appeal of its June 24, 2014, order. This appeal followed.[2]

---

[2]While this appeal was under consideration, the parties entered a settlement agreement with regard to counts II and III of CHA's third amended complaint. The circuit court entered an order dismissing those two counts on October 20, 2015.

¶ 12    ANALYSIS

¶ 13    CHA contends the circuit court erred in dismissing its breach of contract claim, in which it alleged defendant failed to comply with the federal accessibility standards, where the state law claim was not preempted by federal legislation because it was based on the terms of the parties' contract and not due to a violation of Section 504 or the ADA.

¶ 14    CHA appeals the dismissal of its amended complaint pursuant to section 2-619 of the Code. A section 2-619 motion to dismiss admits the legal sufficiency of the complaint, but asserts an affirmative matter to otherwise defeat the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31. In considering a section 2-619 motion to dismiss, a court reviews all pleadings and supporting documents in a light most favorable to the nonmoving party. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367-68 (2003). However, conclusions of fact or law unsupported by allegations of specific facts are not taken as true and are not considered by the court in ruling on the motion. *Mayfield v. Acme Barrel Co.*, 258 Ill. App. 3d 32, 34 (1994). The court must determine whether the existence of a genuine issue of material fact precludes dismissal or, absent such an issue of fact, whether the asserted affirmative matter makes dismissal proper as a matter of law. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). We review the dismissal of a complaint pursuant to section 2-619 *de novo*. *Id*. at 116.

¶ 15    Pursuant to the supremacy clause, the federal government has the authority to preempt state law to the extent necessary to achieve a federal purpose. U.S. Const., art. VI, cl. 2. "Pre-emption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). Where no explicit preemptive language appears within the statute at issue, the United States Supreme Court has recognized at least two types of implied preemptions: (1) "field pre-emption, where the scheme of federal regulations is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it [citation], and [(2)] conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, [citation], or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, [citations]." (Internal quotation marks omitted.) *Id*.

¶ 16    In the present case, only conflict preemption, or obstacle preemption, as it is also known, is at issue. Conflict or obstacle preemption applies when "the imposition of state standards would conflict with federal law and interfere with federal objectives." *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). The party asserting federal preemption has the burden of persuasion. *Elam v. Kansas City Southern Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011). Whether a state law claim preempts a federal statute is a question of law subject to *de novo* review. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 194 (2008).

¶ 17    CHA argues that its breach of contract claim based upon defendant's failure to meet its obligations to follow the federal accessibility standards, as stated in the parties' restated design contract, does not conflict with federal law, but instead supports it. More specifically, CHA asserts that its attempt to enforce the parties' contract is a means to hold defendant accountable so that taxpayer money is not misused and disabled persons do not suffer

discrimination. Moreover, CHA disputes that its breach of contract claim is a *de facto* indemnity claim, maintaining that *Equal Rights Center* has no application to this case where there has been no violation of Section 504, the ADA, or any other federal fair housing law. In fact, CHA contends its breach of contract claim asserted an obligation independent of any responsibility to comply with the federal accessibility standards. Further, CHA argues that the damages sought were limited to economic losses incurred as a result of defendant's failure to perform its contractual obligations and, thus, were recoverable pursuant to a breach of contract action.

¶ 18    Defendant responds that federal and state courts in other jurisdictions consistently have held that state-law causes of action seeking recovery of costs incurred for noncompliance with federal accessibility standards are preempted and barred whether the actions are styled as indemnity, contribution, or breach of contract claims. Defendant maintains that permitting CHA to proceed with its state-law breach of contract action would discourage CHA from fulfilling its own obligations to prevent discrimination under Section 504 and the ADA, directly undermining the goal and purpose expressed by Congress in enacting those statutes.

¶ 19    The principle purpose of the ADA is "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities [and] (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b) (2006). Congress, therefore, intended to remedy discrimination against disabled individuals, as well as to prevent discrimination against the same group. " 'To effectuate its sweeping purpose,' the ADA has a comprehensive scope covering discriminatory practices that disabled persons face 'in major areas of public life,' including access to public accommodations." *Rolf Jensen & Associates, Inc. v. District Court*, 282 P.3d 743, 747 (Nev. 2012) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)). An owner will be found liable for discrimination when a facility is not designed and constructed to accommodate individuals with disabilities, no matter the intent of the owner. *Id*. (quoting 42 U.S.C. § 12182(a) (2006), and 42 U.S.C. § 12183(a)(1) (2006)). "Notably, however, with the exception of landlord-tenant relationships, [citation], there are no provisions within the ADA, or its accompanying regulations, that permit indemnification or the allocation of liability between the various entities subject to the ADA." *Id*.

¶ 20    The question before us has not been addressed by this court or our supreme court. A similar situation, however, was considered by the Fourth Circuit in *Equal Rights Center*. In *Equal Rights Center*, an owner of multifamily housing complexes, the architect of the complexes, and others in the construction industry were sued for violating accessibility provisions of the federal housing authority (FHA) and the ADA. *Equal Rights Center*, 602 F.3d at 598-99. The owner entered into a consent decree with the plaintiffs that required the owner to bring the buildings into compliance and to pay $1.4 million in damages and fees. The architect entered into a separate consent decree with the plaintiffs. The owner subsequently sued the architect for indemnification, breach of contract, and negligence, seeking indemnification for the retrofitting of the properties designed by the architect, as well as all related settlement amounts, costs, and attorney fees paid to the plaintiffs. *Id.* at 599-600.

¶ 21    The Fourth Circuit affirmed the district court's order granting summary judgment in favor of the architect, finding all of the owner's claims were preempted by the FHA[3] and ADA. *Id.* at 600. In so finding, the Fourth Circuit stated that "compliance with the ADA and FHA, as conceded by [the owner], is nondelegable in that an owner cannot insulate himself from liability for … discrimination in regard to living premises owned by him and managed for his benefit merely by relinquishing the responsibility for preventing such discrimination to another party." (Internal quotation marks omitted.) *Id.* at 602. The Fourth Circuit continued, "[a]llowing an owner to completely insulate itself from liability for an ADA or FHA violation through contract diminishes its incentive to ensure compliance with discrimination laws. If a developer *** who concededly has a non-delegable duty to comply with the ADA and FHA, can be indemnified under state law for its ADA and FHA violations, then the developer will not be accountable for discriminatory practices ***. Such a result is antithetical to the purposes of the FHA and ADA." *Id.*; see also *United States v. Quality Built Construction, Inc.*, 309 F. Supp. 2d 767, 778-79 (E.D.N.C. 2003) (there is nothing in the legislative history of the FHA stating or implying a right to contribution or indemnity); *United States v. Shanrie Co.*, 610 F. Supp. 2d 958, 960-61 (S.D. Ill. 2009); *Rolf Jensen & Associates*, 282 P.3d at 748-49; *Mathis v. United Homes, LLC*, 607 F. Supp. 2d 411, 421-23 (E.D.N.Y. 2009); *United States v. Bryan Co.*, No. 3:11-CV-302-CWR-LRA, 2012 WL 2051861, at *4-5 (S.D. Miss. June 6, 2012); *Miami Valley Fair Housing Center, Inc. v. Campus Village Wright State, LLC*, No. 3:10cv00230, 2012 WL 4473236, at *4 (S.D. Ohio Sept. 26, 2012).

¶ 22    We recognize that *Equal Rights Center* is not a case from our jurisdiction. However, "[w]hen interpreting federal statutes, we look to the decisions of the United States Supreme Court and federal circuit and district courts." *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 33. Our supreme court advised that, in the absence of a decision of the United States Supreme Court, we should give considerable weight to the decisions of federal courts of appeals and federal district courts that have addressed the issue presented, especially in light of the importance of maintaining a uniform body of law in interpreting federal statutes. *Id.* (citing *Sprietsma v. Mercury Marine*, 197 Ill. 2d 112, 119-20 (2001)). The parties have not cited, and our research has not revealed, a United States Supreme Court case providing guidance tailored to the facts before us. We, therefore, find *Equal Rights Center* bears considerable weight in our analysis.

¶ 23    The question, then, is whether CHA's breach of contract claim is a *de facto* indemnity claim similar to that in *Equal Rights Center*. Courts have recognized the distinction between a state-law claim seeking indemnification or contribution related to proven FHA violations and a state-law contract claim arising from a breach of a duty imposed by the particular terms of the contract. *Miami Valley Fair Housing Center, Inc.*, 2012 WL 4473236, at *9 (citing *Quality Built Construction, Inc.*, 309 F. Supp. 2d at 778-79). The distinction, and possibility, for a state-law breach of contract claim hinges on the substance of the claim, not simply its label.

¶ 24    In this case, CHA's breach of contract claim sought recovery from the losses it sustained in bringing the units worked on by defendant into compliance with the federal accessibility

---

[3]The purpose of the FHA is "to provide *** for fair housing throughout the United States." 42 U.S.C. § 3601 (2006).

standards. We recognize that CHA did not receive a formal violation by HUD or incur fines or fees related to litigating and/or settling any formal violations. The breach of contract claim, however, was based on the requisite retrofitting CHA had to perform as a result of the preliminary noncompliance letter issued by HUD following its review of the subject premises. Although the parties' restated design contract included language requiring defendant to perform its obligations in compliance with the federal accessibility standards, the duties imposed by the contract language were in fact imposed by HUD and then incorporated into the parties' contract. As a result, the alleged breach of defendant's duties to comply with federal accessibility standards necessarily arose from its failure to comply with the duties imposed by HUD. If not for HUD's compliance review, CHA would not have been issued a preliminary noncompliance letter and would not have negotiated a voluntary compliance agreement with HUD. In turn, CHA would not have incurred the costs associated with reworking the subject premises to bring them into compliance with the federal accessibility standards. Overall, no matter the label of CHA's cause of action, the breach of contract claim was a *de facto* indemnity claim and, therefore, was preempted.

¶ 25    CHA cites, *inter alia*, *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir. 1989), to demonstrate "the fundamental flaw" in the circuit court's dismissal of its breach of contract claim. In *Baker, Watts & Co.*, the Fourth District concluded that a state-law indemnification claim was preempted by the Securities Exchange Act of 1933. Reviewing the regulatory goals of the federal statute, the court determined, where "Congress ha[d] not provided a right to indemnification in the federal securities laws under any circumstances," "it would run counter to the basic policy of the federal securities laws to allow a securities wrongdoer *** to shift its *entire* responsibility for federal violations on the basis of a collateral state action for indemnification." (Emphasis added.) *Id.* at 1108; *cf. Delay v. Rosenthal Collins Group, LLC*, 585 F.3d 1003, 1006 (6th Cir. 2009) (finding a state-law indemnification claim was not preempted by a party explicitly found *not* to have violated federal law). According to CHA, its claim cannot be preempted where its compliance with Section 504 through the voluntary compliance agreement distinguished it from a "wrongdoer." We disagree.

¶ 26    As we have recognized, CHA officially did not violate Section 504 or the ADA; however, CHA was a "wrongdoer" in the sense that it failed to ensure the subject premises complied with the applicable federal accessibility standards in order to prevent discrimination. Instead, HUD was forced to expressly notify CHA that the elderly residential apartment units worked on by defendant failed to comply with Section 504 and the ADA. Accordingly, CHA failed to uphold the responsibilities required of building owners under the federal accessibility standards. A defendant who has violated the FHA is "clearly not among the class which the statute is intended to protect, but rather [is] the [party] whose conduct the statute was intended to regulate." *Quality Built Construction, Inc.*, 309 F. Supp. 2d at 778; see also *Shanrie Co.*, 610 F. Supp. 2d at 961 ("[i]n structuring the FHAA, Congress failed to provide a contribution or indemnification remedy for one defendant against a third-party co-defendant. The failure to include such a remedy 'raises the presumption that Congress deliberately intended that each co-defendant have a non-indemnifiable, non-delegable duty to comply with the FHA.' " (quoting *United States v. Gambone Brothers Development Co.*, No. 06-1386, 2008 WL 4410093, at *8 (E.D. Pa. Sept. 25, 2008)). Again, recognizing the unique set of circumstances before us, in that CHA did not receive a formal violation of Section 504

or the ADA, we find the reasoning equally applies to the statutes at issue in this case. CHA's failure to appropriately supervise the construction of the subject premises was not conduct Section 504 and the ADA were intended to protect.

¶ 27    In sum, despite CHA's argument that its claim has an independent basis in the parties' contract, what the claim was predicated on and what it sought to recover was the cost of retrofitting the residential units in the seven buildings worked on by defendant as required by the voluntary compliance agreement that it negotiated with HUD. If not for the voluntary compliance agreement, CHA would not have raised a claim. Allowing CHA to seek indemnification from defendant effectively would insulate it from liability. Such an outcome is contrary to the goal of the ADA of preventing and remedying discrimination against disabled individuals. Because allowing the state-law claim would interfere with Congress' goal, CHA's breach of contract claim is preempted under the obstacle preemption doctrine.

¶ 28    As a final note, we find *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2011), as cited by CHA, is distinguishable from the case before us. In *Wigod*, the plaintiff brought, *inter alia*, a breach of contract claim and an Illinois Consumer Fraud and Business Practices Act claim against the defendant bank for failing to honor its promise to permanently modify her mortgage after she demonstrated her qualifications under the federal Home Affordable Mortgage Program (HAMP). The Seventh Circuit distinguished between "conventional" claims of misrepresentation or breach of contract from those that would effectively impose state-law rules on mortgage servicing, which would be preempted as impermissibly interfering with federal regulations. *Id*. at 578-79. The *Wigod* court concluded that HAMP did not preempt the state-law claims because the federal statute limited its preemptive effect to conflicting state laws. The breach of contract and deceptive business practices claims complimented HAMP as opposed to conflicting with the federal statute. *Id*. In contrast to the securities law at issue in HAMP, the federal laws in the case before us conflict with the state-law claim such that any attempt to seek indemnity for lack of compliance with Section 504 and the ADA would frustrate Congress' purpose in enacting the statutes.

¶ 29                                        CONCLUSION
¶ 30    We affirm the judgment of the circuit court.

¶ 31    Affirmed.